**IMS HEALTH, INC., Plaintiff,**

v.

**VALITY TECHNOLOGY INC., Defendants.**

**Civil Action No. 99–1500.**

United States District Court,
E.D. Pennsylvania.

July 28, 1999.

Lee A. Rosengard, Marianne Johnston, Stradley, Ronon, Stevens & Young, LLP, Philadelphia, PA, for plaintiff.

John P. Donohue, Jr., Philadelphia, PA, for defendant.

### MEMORANDUM

LOWELL A. REED, Jr., Senior District Judge.

Presently before the Court is the motion of defendant Vality Technology Inc. ("Vality"), to dismiss the complaint, or in the alternative to transfer or stay these proceedings (Document No. 2), the response of plaintiff IMS Health Incorporated ("IMS") thereto, the cross-motion of IMS to enjoin defendant Vality from proceeding with the later-filed, related action in the United States District Court for the District of Massachusetts (Document No. 6), the reply of Vality in support of its motion to dismiss, transfer, or stay these proceedings, and in opposition to the cross-motion of IMS enjoin Vality from proceeding with the later-filed action, and the sur-reply of IMS thereto. Based on the following analysis, the motion of the Vality will be denied. The cross-motion of IMS will be granted.

### I. Background

IMS is a corporation based in Plymouth Meeting, Pennsylvania which provides information services to the pharmaceutical and health care industries. In order to best provide these services, IMS has developed databases which contain information on pharmaceutical wholesale transactions within the United States, the habits of pharmaceutical prescribers, and preferred addresses for use by pharmaceutical sales representatives.

In early 1994, IMS entered into what would become an ongoing relationship with MatchWare Technologies, Inc. ("MatchWare"), a Maryland-based firm which provided IMS with software ("MatchWare software" or "matching software") that was useful in organizing and facilitating more productive utilization of the large data sets collected by IMS. (Affidavit of Ilene Blanton ¶ 2). This relationship commenced with a presentation at the Plymouth Meeting facility by Matthew Jaro, the President of MatchWare, which was followed by several extended episodes in 1994 and 1995 during which Mr. Jaro worked at that facility with IMS personnel and systems in order that the MatchWare software could be modified for use in IMS's mainframe system. (Affidavit of Ilene Blanton ¶¶ 3, 6, 7). On or about July 25, 1994, IMS and MatchWare executed an End–User License Agreement and Source Code License Agreement relating to the use by IMS of IBM MVS versions of the MatchWare software. On or about September 8, 1994, they executed a similar agreement which pertained to HP UNIX versions of the software (collectively "the 1994 agreements"). (Affidavit of Inez H. Friedman ¶¶ 2, 3). The 1994 agreements were negotiated and executed at the IMS facility in Plymouth Meeting, Pennsylvania. (Affidavit of Stephen L. Engber ¶¶ 3, 4).

During the period following the execution of these documents and continuing through November, 1997, an interval which saw the entry of IMS and MatchWare into another End User License Agreement, IMS and MatchWare enjoyed an apparently trouble-free relationship which was marked by frequent service visits by Mr. Jaro to the Plymouth Meeting facility, as were required under the 1994 agreements.

(Affidavit of Ilene Blanton ¶ 11). Further, in July of 1996 and August of 1997, IMS and MatchWare entered into additional maintenance, support and training agreements relating to the MatchWare software. (Affidavit of Stephen L. Engber ¶ 5).

In December 1997, Vality, a Massachusetts corporation, acquired MatchWare, (Plt. Mem. at 8), and became the successor-in-interest to MatchWare, a status which still characterizes it today.[1] (Def. Mem. at 2). Over a year later, on or about January 14, 1999, a meeting transpired between officers of IMS and Vality at the Boston headquarters of Vality. At this meeting, Mark. E. Atkins, President of Vality, alleged that IMS had misappropriated its trade secrets and engaged in unauthorized use of its copyrighted matching software. (Affidavit of Stephen L. Engber ¶ 9). Specifically, Vality alleges that while the agreements between it and IMS were "end-user" agreements, meaning that IMS was authorized only to use the matching software for its own internal purposes and not for providing data-processing services to third parties,[2] IMS was in fact using the software to provide precisely these services to its own clients. (Memorandum of Law in Support of Motion of Defendant ("Def. Mem." at 4, 5)).

Over the ensuing months, the parties then engaged in an exchange of letters and conference calls focusing on the proper interpretation of the 1994 agreements, and on how to resolve the disagreement which had developed between them. Although Mr. Jaro asserts that "[t]he negotiations respecting Vality's claim that IMS's conduct breached the [1994 agreements] … took place primarily in Massachusetts," (Affidavit of Matthew Jaro ¶ 7), it is unclear what he means by this statement, as except for the January 12, 1999 meeting when the allegations were first leveled, no face to face meeting is alleged by either party to have taken place. The only contacts discussed by either party were the aforementioned letters and conference calls, and there is every indication that these occurred with all IMS officers situated in Plymouth Meeting, and all Vality officers in Boston.

IMS contends that Vality's communiques expressly threatened litigation. (Affidavit of Stephen L. Engber ¶ 12). Vality argues that no such threat was made or reasonably inferred from any of the letters exchanged. (Def. Mem. at 6–9). In contrast, the defendant asserts that the parties were attempting to come to an amicable resolution of the dispute when IMS filed this declaratory judgment action on March 25, 1999. (Def. Mem. at 9). Finally, on May 5, 1999, Vality filed an action in the District of Massachusetts ("the Massachusetts action") in which it asserted claims sounding in copyright infringement, breach of contract, breach of implied covenant of good faith and fair dealing, quantum meruit and misappropriation of trade secrets.

Vality moves to dismiss the complaint on the ground that the Court lacks subject matter jurisdiction over the action, as no actual case or controversy existed at the time of filing. In the alternative, Vality argues that the Court should decline to exercise its discretionary jurisdiction over this declaratory judgment action because: (1) IMS engaged in strategic, preemptive litigious tactics which should not be rewarded by this Court via a refusal to dismiss; (2) the "first-filed" rule is not controlling; and (3) the balance of conveniences and judicial economy favor proceeding in the United States District Court for the District of Massachusetts.

1. IMS does not dispute this. Accordingly this Court will impute to Vality the relevant acts and omissions of MatchWare which form the background of the current dispute.

2. The parties do not contest that the provision of such data to third parties is actually the sort of activity contemplated by Vality's "service bureau" license, as opposed to the "end-user" which it also offers at a significantly higher cost.

In the alternative, Vality moves to transfer the case to the District of Massachusetts under 28 U.S.C. § 1406(a) on the ground that substantial activity giving rise to the claims did not occur in Pennsylvania, thus rendering venue improper under 28 U.S.C. § 1391(b), and making § 1406(a) applicable.

In the alternative, Vality moves to transfer the case to the District of Massachusetts under 28 U.S.C. § 1404(a) on the grounds that (1) the District of Massachusetts is a more convenient forum than the Eastern District of Pennsylvania, (2) the interest of justice mandates transfer, and (3) the case "might have been brought" in Massachusetts.

In the alternative, Vality moves to stay these proceedings pending the resolution of the Massachusetts action.

IMS responds to the motion of Vality by arguing that (1) the Court does have subject matter jurisdiction over the action, (2) the "first-filed rule does require the Court to retain this jurisdiction, and (3) Vality is not entitled to a transfer of venue pursuant to either 28 U.S.C. § 1404(a) or 28 U.S.C. § 1406(a). IMS also cross-moves the Court to enjoin Vality from proceeding in the Massachusetts action."

## II. Dismissal for Lack of Subject Matter Jurisdiction

### A. Standard

■ 28 U.S.C. § 2201(a) (1994) reads in relevant part:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

The Declaratory Judgment Act has a remedial character, and should therefore be interpreted liberally. *Algrant v. Evergreen Valley Nurseries, Ltd. Partnership*, 126 F.3d 178, 189 (3d Cir.1997) (Mans-

mann, J., dissenting) (citing *Exxon Corp. v. Fed. Trade Comm'n*, 588 F.2d 895, 900 (3d Cir.1978)). Despite this predilection, however, a court may assert jurisdiction over an action brought pursuant to the Declaratory Judgment Act only if an actual case or controversy which is ripe for disposition is before the tribunal. *See Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1153–54 (3d Cir.1995).

■ In order to satisfy the "actual controversy" requirement, a declaratory judgment action must present a controversy that " '(1) is real and not hypothetical; (2) affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) sharpens the issues for judicial resolution.' " *Travelers Ins. Co.*, 72 F.3d at 1154 (quoting *Armstrong World Indus. v. Adams*, 961 F.2d 405, 410 (3d Cir.1992)). "Basically, the question ... is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

■ Ripeness, similarly, is determined by examining (1) the adversity of the interest between the parties to the action, (2) the conclusiveness of the declaratory judgment, and (3) the utility or practical help that a declaratory judgment would provide. *See TIG Ins. Co. v. Insinger Mach. Co., Inc.*, No. Civ.A.97–3164, 1998 WL 748287, at *3 (E.D.Pa. Oct.27, 1998) (citing *Armstrong*, 961 F.2d at 411).

There is a great deal of overlap in the factors needed to make these two determinations, and at the core of both inquiries are the following questions, as this Court has previously articulated: "whether a controversy is based on real and concrete facts, whether the parties are adverse, and the potential conclusiv[eness] of the declaratory action go to the fitness of the issues

for judicial review." *TIG Ins. Co.*, 1998 WL 748287, at \* 3. It is this amalgamated inquiry with which the Court is concerned.[3]

### B. Real and Concrete Facts

Here, the dispute is indisputably real, and indeed, Vality does not contend otherwise. The allegations of copyright infringement leveled by Vality are of a highly specific nature, based upon equally specific facts, and the outcome of the suit will squarely affect the respective rights and obligations of the parties to this suit. The contentions of both Vality and IMS provide this Court with a clear factual predicate for reasoned, sharpened adjudication.

### C. Conclusiveness

The Court of Appeals for the Third Circuit has stated that in order for a declaratory judgment to be considered conclusive, it must change or clarify the legal status of the parties, not merely lend the opinion of the court on a hypothetical set of facts. *Travelers Ins. Co.*, 72 F.3d at 1155. In the context of this case, this requirement is unquestionably met. Consider, for example, the possibility that the motion of IMS for a declaratory judgment was granted. In that instance, it is likely that the plaintiff could rest assured that, despite the contrary contentions of Vality, it did not infringe on any of the copyrights held by the defendant. Such would unquestionably constitute a clarification of the legal status of the parties, and this element of the test is therefore satisfied.

### D. Adversity of Interests

■ The Court of Appeals for the Third Circuit has also spoken on the adversity of interests, the remaining component of the present inquiry: "[p]arties' interests are adverse where harm will result if the declaratory judgment is not entered." *Travelers Ins. Co.*, 72 F.3d at 1154. Thus, importantly, "in an appropriate circumstance, a litigant can seek a declaratory judgment where the harm is threatened in the future. However the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (citation omitted).

■ This is the point at which Vality has selected to attack the proposition that this Court has jurisdiction over this matter. In fact, the gravamen of the argument made by Vality is that IMS did not have a reasonable apprehension of a lawsuit at the time of filing. It contends that the parties were engaged in continuing efforts to resolve the matter out of court when IMS, on the same day that it sent a letter to Vality indicating its continuing interest in negotiation, filed this action. IMS had no reason to believe, Vality posits, that litigation was imminent, or even likely. Vality specifically argues that had IMS truly feared litigation, it would have filed this action directly after the January 14, 1999 meeting, the only time, according to Vality, at which any express reference to litigation was made. (Reply at 4–5). Vality contends that IMS could not have been forced to endure tactics designed to intimidate Vality, as IMS is a corporation of global proportions, employing in excess of 8,500 employees and generating over $1.2 billion in revenues in 1998. (Reply at 7). It also asserts that, as a matter of law, the fact that Vality later commenced the Massachusetts action is insufficient as a basis for a claim that Vality had a reason-

---

**3.** It should be noted that this is a fairly stringent standard as compared to those articulated by some other courts. *See, e.g. Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed.Cir.1993) ("When the [declaratory defendant] has explicitly charged that a current activity of the declaratory plaintiff is an infringement, 'certainty has rendered apprehension irrelevant, and one need say no more.'") (quoting *Arrowhead Indus., Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735–36 (Fed.Cir. 1988)), *overruled on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

able apprehension of a lawsuit, as while this occurred after the filing of this action, the law mandates that the filing party have such a fear at the time of filing. Hence, it posits, no justiciable case or controversy existed at that time. At the root of the argument of Vality is the notion that for this Court to hold a case or controversy existed at the time of filing here, it would undermine the public policy that "potential litigants must be encouraged to seek to avoid litigation rather than adopt a 'sue first, talk later' philosophy." *Hanson PLC v. Metro–Goldwyn–Mayer Inc.*, 932 F.Supp. 104, 107–08 (S.D.N.Y.1996).

I, however, find this view to be unpersuasive. First, while the series of correspondence between the parties is not replete with explicit threats to sue, the specter of litigation undoubtedly hung over the post-January 14, 1999 dealings between the parties. Mr. Atkins, stated during the January 14, 1999 meeting that he had "retained 'the best attorney in town.'" (Affidavit of Stephen L. Engber ¶ 10). Deadlines were repeatedly set by Vality for the return of the matching software absent a sizable payment from IMS to Vality (delineated further in note 6), and the overall tone of the letters exchanged between January 19, 1999 and March 25, 1999 was adversarial. Specific references to litigation and breach of contract, for example, are found in the March 5, 1999 and March 25, 1999 letters from IMS to Vality, and the deadlines set by Vality are mentioned in the majority of these communiques as well. (*See* Affidavit of Inez H. Friedman at Exhibits C—H). IMS also alleges that litigation was threatened during telephone conferences between the parties on February 4, 1999 and February 24, 1999. (*See* Affidavit of Stephen L. Engber ¶ 12). While Vality does not contest the account of the January 14, 1999 meeting offered by IMS, it does take issue with this characterization of the telephone conversations. (Reply at 4–5).

It is quite possible for two parties to simultaneously consider nonlitigious settlement of a dispute, while at the same time maintaining an awareness that either settlement is improbable or that litigation is equally likely, particularly where these negotiations have continued over an extended period of time but yielded little in the way of agreement. Thus, while there was no indication on March 25, 1999 that Vality was ready and willing to file an action immediately, given the positions stated and the demands made by Vality, the disagreement in which IMS found itself with these positions, and its unwillingness to acquiesce in those demands, IMS could have justifiably believed, and acted upon the belief that Vality might take such action in the near future. *See Pep Boys, Manny, Moe & Jack v. Am. Waste Oil Servs, Corp.*:

> [W]hile it was clear that litigation was a threat, should the parties fail to resolve their differences amicably, litigation initiated by [plaintiff] was not yet imminent at the time the [first] action was filed. Plaintiff was still willing to meet with Defendants to try to reach a settlement. In addition, Plaintiff, while acknowledging the possibility of litigation, had not yet directly threatened litigation .... Defendants' decision to forgo settlement discussions is not, by itself, evidence of bad faith. While our judicial system favors and, indeed, relies upon the efforts of parties to resolve their own disputes, Defendants' decision to protect their interests by filing suit does not rise to the level of bad faith.

No. Civ.A.96–7098, 1997 WL 367048, at *8 (E.D.Pa. June 25, 1997). In this case, by contrast, IMS did not forgo settlement negotiations. Indeed, despite being confronted with an unmistakable threat of litigation on January 14, 1999, it waited until March 25, 1999 to file this declaratory judgment action.

As for the contention of Vality that had IMS truly feared litigation, it would have

filed suit immediately upon being so threatened, the simply response is that although it likely could have done so, it opted, in what appears to be an act of good faith, for negotiation in the face of this threat, and should not be penalized for so doing.

Vality is correct as a matter of law that a later filed suit cannot be considered in determining whether a court had jurisdiction over a declaratory judgment action at the time such was filed. *See GTE Directories Publishing Corp. v. Trimen Am., Inc.,* 67 F.3d 1563, 1568 (11th Cir.1995) ("A case or controversy must exist at the time the declaratory judgment action is filed.") (citing *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 781 F.2d 879, 883 (Fed.Cir.1985) and *Luis v. Dennis,* 751 F.2d 604, 608 (3d Cir.1984)). This, however, does not undermine the argument espoused by IMS that an actual controversy existed, as the actions of Vality prior to the filing of this action provided IMS with a reasonable apprehension of litigation.

As for the policy argument of Vality that the "sue first talk later" philosophy must be not be facilitated, I find that although this policy is undoubtedly sound in theory, it is outweighed here by the policy underlying the Declaratory Judgment Act. Instead of allowing IMS to seek an affirmative declaration of its freedom from liability with the threat of an affirmative filing by Vality looming in the indeterminate future, a decision to dismiss for lack of an actual controversy would punish IMS for taking precisely those actions. Allegations of copyright infringement are serious charges, and the potential liability for such acts is severe. Any financially responsible party, no matter how full its coffers, would be at the very least concerned at the leveling of such accusations against it. Moreover, as stated in its sur-reply, IMS would likely suffer significant disruption of its operations were it forced to replace the MatchWare software, as the degree to which IMS relies upon the software appears to be considerable. (Sur-

Reply of IMS in Opposition to the Motion of the Defendant ("Sur–Reply") at 2).

As the Court of Appeals for the Federal Circuit has explained, "after the [Declaratory Judgment] Act ... competitors were no longer restricted to an in terrorem choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests." *Arrowhead Indus. Water,* 846 F.2d at 734–35. It is clear that this reasoning applies with equal force in this, an infringement action of a different sort. Indeed, the central point of the Declaratory Judgment Act is that a party is not required to talk until the other party decides to sue. Indeed, had the threat of "the Sword of Damocles" not been felt by IMS to any extent, this action would be improper. *Hunt Mfg. Co. v. Fiskars Oy AB,* No. Civ.A.97–2460, 1997 WL 667117, at \*4 (E.D.Pa. Oct.2, 1997); *see also Genentech v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed.Cir.1993). Therefore, I find that the interests of the parties were adverse at the time of the filing of this action.

Given this analysis, all aspects of the inquiry delineated by the Court of Appeals for the Third Circuit in *Armstrong World Indus. v. Adams,* 961 F.2d 405, 410 (3d Cir.1992) and *Travelers Ins. Co. v. Obusek* are satisfied in this case, and subject matter jurisdiction therefore exists over this declaratory judgment action. Dismissal on the grounds of the lack of a justiciable case or controversy would consequently be inappropriate.

### III. The First–Filed Rule

IMS contends not only that jurisdiction over this action is proper in this Court, as a justiciable case or controversy exists, but further that the first-filed rule mandates the retention of this action here. Vality asserts that because IMS engaged in forum shopping and acted in bad faith, both of which constitute exceptions to the first-filed rule, *see EEOC v. University of*

*Pennsylvania,* 850 F.2d 969, 976 (3d Cir. 1988), that rule does not require the Court to retain jurisdiction.[4] I find the arguments made by Vality to be unpersuasive.

 In brief, the first-filed rule stands for the proposition that "[i]n all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it." *University of Pennsylvania,* 850 F.2d at 971 (internal quotation omitted). "It gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *Id.* Though the rule cannot be applied in an overly rigid fashion "without regard to rare or extraordinary circumstances, inequitable conduct, bad faith, or forum shopping," *id.* at 972, " 'courts must be presented with exceptional circumstances before exercising their discretion to depart from the first-filed rule.' " *Pep Boys,* 1997 WL 367048, at *5 (quoting *University of Pennsylvania,* 850 F.2d at 979).

 The only the exceptions to the first-filed rule which are relevant in this case are the two mentioned above: forum shopping and bad faith. The two inquiries are quite similar, as paramount in both considerations is the question of whether the first-filed action was filed in " 'apparent anticipation of imminent judicial proceedings' " by the opposing party. *University of Pennsylvania,* 850 F.2d at 977 (quoting *Yoder v. Heinold Commodities, Inc.,* 630 F.Supp. 756, 760, 761 (E.D.Va. 1986)). This was explained by the court in *Hunt Mfg. Co.:*

> The purpose of the Declaratory Judgment Act is "to enable a person caught in controversy to obtain resolution of the dispute, instead of being forced to await the initiative of the antagonist."

*Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed.Cir.1993). In many cases, the declaratory defendant is prepared to, and does, file its own affirmative suit shortly afterwards. Therefore, a district court cannot dismiss a proper declaratory action merely because affirmative infringement litigation is subsequently brought elsewhere. See [*id.*] at 938. It may, however, dismiss the action where it is shown that the declaratory action was filed in anticipation of the impending litigation and motivated *solely* by considerations of forum shopping. See [*Serco Servs. Co., L.P. v. Kelley Co., Inc.,*] 51 F.3d [1037,] 1040 [ (Fed.Cir.1995) ] . . . .

1997 WL 667117, at *3 (emphasis added).

In addition to the foregoing, the bad faith inquiry also encompasses consideration of the amount of time between the declaratory and affirmative filings, with a shorter period indicating bad faith, *see Hanson v. Metro–Goldwyn–Mayer Inc.,* 932 F.Supp. 104, 106 (S.D.N.Y.1996), and whether the suit preemptively foreclosed settlement opportunities. *Id.* at 107.

In support of its position, Vality analogizes the instant facts to several cases in which exceptions to the rule were made. In *University of Pennsylvania,* the EEOC was prepared to commence an imminent subpoena enforcement action against the University when the latter, mindful of precedent in District of Columbia Circuit,[5] with which it had no other connection, filed an action in that district. 850 F.2d at 977.

In *One World Botanicals, Ltd. v. Gulf Coast Nutritionals, Inc.,* the court explicitly indicated the importance of the fact that the declaratory plaintiff filed its action for a declaratory judgment "in [conscious] anticipation of [the declaratory defendant's] infringement action." 987 F.Supp. 317,

---

4. The decision of whether or not to hear a declaratory judgment action is left to the limited discretion of the district court. *See Wilton v. Seven Falls Co.,* 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

5. This precedent indicated a hostility on the part of that court toward the enforcement of subpoenas demanding peer review records, precisely the type of documents sought by the EEOC.

329 (D.N.J.1997). The affirmative suit was filed a mere seven days after the declaratory judgment action in that case.

In *Hanson*, the declaratory plaintiffs made no effort at settlement, as they filed the declaratory judgment action a mere three days after receiving the cease and desist letter which sparked their actions. Further, the filing of an affirmative suit by the declaratory defendant was quite imminent, as that party indicated that it would begin litigation if a prompt settlement could not be reached, and that it had a complaint already prepared when the declaratory judgment action was filed. The declaratory plaintiff even apologized for the filing of the declaratory action, given the temporal proximity of the affirmative filing. *See* 932 F.Supp. at 106. The *Hanson* court also declared that "allowing this action to proceed would discourage potential plaintiffs from initiating settlement discussions prior to filing suit." *Id.* at 107.

Vality specifically argues that the facts of this case are similar, as IMS deliberately lulled Vality into believing that it was willing to engage in settlement negotiations and then, in bad faith, secretly filed this preemptive declaratory judgment action. (Def. Mem. at 12–13, 15). Vality asserts that in a letter from Stephen Engber, Vice President of Technical Services of IMS, to Mark Atkins dated March 25, 1999, the former requested further negotiations between Vality and IMS. Then, before Vality could respond, IMS raced to the courthouse and filed this action that same day.

As far as the allegation of forum shopping leveled by Vality against IMS is concerned, there is no indication that a situation analogous to that in *University of Pennsylvania* exists here, i.e. that practice in this district or the precedent of the Court of Appeals for the Third Circuit is less conducive in any way to the success of copyright infringement claims than is practice or judicial policy in the District of Massachusetts or the jurisprudence of the Court of Appeals for the First Circuit.

This finding, coupled with the conclusion, below, that an affirmative filing by Vality was not imminent in the eyes of IMS when it filed this action, dictates that the first-filed rule will not be abrogated in this case on forum shopping grounds.

Turning to Vality's argument that IMS acted in bad faith in filing its declaratory action in this Court, I conclude that while litigation was in the air here, it does not appear that such was nearly as imminent as in *University of Pennsylvania, One World Botanicals* or *Hanson*. Numerous deadlines after which litigation would purportedly ensue had been set by Vality, and expired without consequence. Indeed, IMS did not file this suit immediately before such a deadline was to arrive, as did the declaratory plaintiff in *University of Pennsylvania*. Nor is there is any indication whatsoever that a complaint had already been prepared and was in the possession of Vality when IMS filed this action, or if that was the case, that IMS was aware of such. Even were such a showing to be made, IMS is a corporation headquartered in this district, and has alleged that many of its witnesses and all of the evidence in its possession are located here. As was the case in *Fundamental Too, Ltd. v. Universal Music Group, Inc.,* these circumstances indicate that bad faith or forum shopping was not the *sole* motivation behind the actions of IMS. *See* No. Civ.A.97–1595, 1997 WL 181255, at *5 (E.D.Pa. Apr.10, 1997).

Second, allowing this action to proceed would not provide a disincentive to settlement, as roughly three and one-half months passed between the January 14, 1999 meeting and the filing of this action, during which time they made little if any headway toward resolving their dispute. While IMS did file this action the same day it wrote to Vality inviting further negotiations, this was merely the latest in a lengthy series of exchanges between the parties. If IMS really was interested in racing to the courthouse, it seems probable that it would have done so well before

three months had passed from the time of the January 14, 1999 meeting.

Finally, the affirmative filing of Vality did not immediately follow the institution of this action; rather six weeks passed before the complaint was filed in Massachusetts. This is a marked departure from the facts of *One World Botanicals,* and further indicates that the filing by IMS of this action was likely not in anticipation of an imminent affirmative filing by its adversary.

As additional evidence of bad faith, Vality contends that IMS, having filed this action on March 25, 1999, waited until April 12, 1999 before serving Vality with a copy of the complaint. (Reply at 1). This, however, is well within the bounds established by Fed.R.Civ.P. 4(m), and does not indicate bad faith. *See University of Pennsylvania,* 850 F.2d at 972 and *One World Botanicals,* 987 F.Supp. at 328.

Thus, contrary to Vality's assertions, the cases on which it relies do not instruct this Court that the bad faith or forum shopping exceptions to the first-filed rule are applicable here. The Court concludes, by contrast, that neither exception is applicable, and the rule mandates that this action remain in this Court. The Court will therefore not exert its discretion in the manner suggested by Vality, and will instead exercise jurisdiction over this declaratory judgment action.

## IV. Transfer Pursuant to 28 U.S.C. § 1404(a) or § 1406(a)

The distinction between 28 U.S.C. § 1404(a) and § 1406(a) is straightforward: whereas § 1406(a) provides for the trans-

fer of cases where venue is improper in the transferor district, § 1404(a) provides for the transfer of cases between two districts where the action "might have been brought." 28 U.S.C. § 1404(a) (1948); *see also* 28 U.S.C.A. § 1404 (West Supp.1999), commentary on 1996 amendment of section 1404 at 30; *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 878 (3d Cir.1995). Because the applicability of these statutes turns on whether venue is proper in the Eastern District of Pennsylvania, the Court must first resolve that issue.

■ This is a declaratory judgment action, and therefore, the statute relevant to the venue inquiry is 28 U.S.C. § 2201.[6] However, neither the 1994 agreements nor that statute contain a special venue provision, and therefore the federal venue statute, 28 U.S.C. § 1391(b) is controlling. *See AMP Inc. v. Allied Signal Inc.,* No. CIV.A.98–4405, 1998 WL 967579, at *1 (E.D.Pa. Nov.18, 1998) (holding that where jurisdiction was based on 28 U.S.C. § 2201, venue was determined as per 28 U.S.C. § 1391); *Am. Cyanamid Co. v. Eli Lilly & Co.,* 903 F.Supp. 781, 784 n. 1 (D.N.J.1995) ("Venue in a declaratory judgment action ... is governed by the general venue statute, codified at 28 U.S.C. § 1391(b).").[7]

Under the general venue statute:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in

---

6. This is not so insofar as the Court is concerned with jurisdiction, however. Jurisdiction is proper here under 28 U.S.C. § 1332(a), as IMS is considered a citizen of Pennsylvania pursuant to § 1332(c), and Vality is considered a citizen of Massachusetts under that same subsection, as both are incorporated and have their principal places of business in these districts respectively. Complete diversity is therefore present. I am also satisfied that the $75,000 amount in controversy requirement is also met here, as Vality alleges

in its complaint in the Massachusetts action that the profits received by IMS from its impermissible use of the Matching software is estimated to exceed $150 million. (*See* Plt. Mem. at Exhibit F, p. 10).

7. Both parties also assert that § 1391(b) governs here. (Def. Mem. at 26; Memorandum of Law in Opposition to Motion of Defendant ("Plt.Mem.") at 26 n. 5).

which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). Here, the Court is particularly concerned with § 1391(b)(1),[8] i.e. whether Vality "resides" within the Eastern District of Pennsylvania. The residence of a corporate party is determined by subsection (c) of that statute, which states: "[f]or purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c). Thus, it is this determination of whether Vality was subject to personal jurisdiction in this district at the time this action was commenced that the Court must first make.

 Whether personal jurisdiction may be exercised over a nonresident defendant is a question which depends, first of all, on the scope of the long arm statute of the forum state. *See* Fed.R.Civ.P. 4(e) (authorizing personal jurisdiction over nonresident defendants to the extent permitted by the law of the forum state); *see also Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436 (3d Cir.1987). Pennsylvania's long arm statute, codified at 42 Pa. Cons.Stat. Ann. § 5322(b) (West 1981 & Supp.1998), allows courts within this state to exercise personal jurisdiction over nonresident defendants to the extent permissible under the federal constitution. In other words, provided that a particular exercise of personal jurisdiction is valid under the Constitution of the United States, it is permissible under Pennsylvania's long-arm statute. *See generally Mellon Bank (E.) PSFS Nat. Ass'n. v. Farino*, 960 F.2d 1217, 1220 (3d Cir. 1992).

 Under the federal constitution, specific personal jurisdiction exists only where the defendant has sufficient minimum contacts with the forum state " 'such that [a defendant] should reasonably anticipate being haled into court [in the forum state].' " *Babn Techs. Corp. v. Bruno*, 25 F.Supp.2d 593, 595–96 n. 1 (E.D.Pa.1998) (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). The "constitutional touchstone" of the specific jurisdiction inquiry is whether the defendant purposefully established those contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), *quoted in North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 690 (3d Cir.1990). A defendant should not be subjected to jurisdiction in a particular district "solely as a result of random, fortuitous or attenuated contacts ...." *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. Therefore, "[t]he relationship among the forum, the defendant and the litigation" must also be taken into account. *Mellon Bank (East)*, 960 F.2d at 1221 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). Once minimum contacts are demonstrated, the Court must progress to a determination of whether in personam jurisdiction would comport with " 'traditional notions of fair play and substantial justice.' " *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.*, 75 F.3d 147, 150–51 (3d Cir.1996) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

 In *Mellon Bank (East)*, the Court of Appeals for the Third Circuit held that:

[t]he fact that a non-resident has contracted with a resident of the forum state is not, by itself, sufficient to justify

---

**8.** While § 1391(b)(2) could also be dispositive were the Court to find that substantial events giving rise to the claim transpired in the Eastern District of Pennsylvania, that sort of analysis is unnecessary, given my finding under § 1391(b)(1) that both IMS and Vality are subject to personal jurisdiction in this district.

personal jurisdiction over the nonresident. The requisite contacts, however, may be supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties.

960 F.2d at 1223 (citing *Burger King,* 471 U.S. at 479, 105 S.Ct. 2174). The court went on to declare that because the defendants were aware that they were contracting with a Pennsylvania party, solicited business within Pennsylvania, supplied personal financial information and secured the debts upon which the contract was based with personal guarantees, sufficient minimum contacts existed. *See id.* at 1223–26, 105 S.Ct. 2174.

In another case, the Court of Appeals for the Third Circuit held that the Florida defendant had sufficient minimum contacts with the district of New Jersey, as there were telephone and mail communications between the two parties, delivery of goods by the defendant in New Jersey, and substantial repairs made 'to those goods following their delivery. The Court opined that given these facts, the defendant "availed itself of the privilege of conducting activities in New Jersey." *Mesalic v. Fiberfloat Corp.,* 897 F.2d 696, 699 (3d Cir.1990).

Here, Mr. Jaro, serving as an agent of Vality's predecessor-in-interest, made the initial presentation of the MatchWare software in the Eastern District of Pennsylvania. He also made numerous subsequent service, customization and testing visits to the Plymouth Meeting facility of IMS. These visits were neither rare nor sporadic; they continued regularly from the time the contract was signed in 1994 through 1997. Additionally, both the negotiation and execution of the Mainframe and HP agreements transpired within the Eastern District of Pennsylvania.

Given the existence of this contract, the solicitation of business by MatchWare in the Eastern District of Pennsylvania, the regular interaction between the parties following the execution of the contract, and the numerous telephone and mail communications between the two parties described above, it is apparent that the contacts which exist between Vality, the successor-in-interest to MatchWare, and this district are at least as plentiful as those between the defendants in both *Mellon Bank (East)* and *Mesalic.* It is equally clear that Vality has "'deliberately reached out beyond [Massachusetts] and negotiated with a [Pennsylvania] corporation,' to enter into a 'carefully structured . . . relationship that envisioned continuing and wide-reaching contacts.'" *Vetrotex Certainteed Corp.,* 75 F.3d at 153 (quoting *Burger King,* 471 U.S. at 480, 105 S.Ct. 2174). This district is therefore not one in which Vality would be subject to in personam jurisdiction as a result of "random, fortuitous or attenuated contacts." *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. Rather, Vality has "purposely availed" itself of the privilege of doing business in this district, and further, there is a strong tie between Vality, the Eastern District of Pennsylvania, and the events which comprise the substantive basis of this litigation. As such, I conclude that Vality has minimum contacts with this district which suffice as a basis for the exercise of personal jurisdiction here.

The exercise of in personam jurisdiction over Vality would also comport with traditional notions of fair play and substantial justice. Several factors have been identified as instructive in this inquiry, including: "(1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Database America, Inc. v. Bellsouth Advertising & Pub. Corp.,* 825 F.Supp. 1195, 1212 (D.N.J.1993) (citing *Burger King,* 471 U.S. at 477, 105 S.Ct.

2174). It should be noted, however, that "when minimum contacts have been established, often the interest of the plaintiff and the forum in the exercise of jurisdiction will justify even ... serious burdens placed on the ... defendant." *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

This is precisely such a case. Although a burden will unarguably be placed on Vality if it is compelled to defend this suit in the Eastern District of Pennsylvania, the interest of IMS in obtaining convenient and effective relief would be equally burdened if this Court declined to exercise personal jurisdiction here. Moreover, "Pennsylvania has a substantive interest in preserving the sanctity of contracts which are executed in the Commonwealth." *Babn Techs. Corp.*, 25 F.Supp.2d at 597 n.2. As will be discussed below, judicial efficiency actually dictates the retention of this matter in this Court. Lastly, the shared interest of the several states in furthering fundamental substantive social policies would not be impaired by the exercise of in personam jurisdiction over Vality in this District.

## A. Transfer Pursuant to 28 U.S.C. § 1406(a)

■ Because the exercise of personal jurisdiction over Vality by this Court is perfectly legitimate, Vality may be said to reside in this district pursuant to 28 U.S.C. § 1391(c). Such a conclusion renders venue proper here pursuant to 28 U.S.C. § 1391(b)(1). Therefore 28 U.S.C. § 1406(a) is inapplicable in this case.[9] Thus, if the Court were to find transfer to be appropriate, 28 U.S.C. § 1404(a) would necessarily be the basis for such a finding.

## B. Transfer Pursuant to 28 U.S.C. § 1404(a)

28 U.S.C. § 1404(a) reads, in relevant part: "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Three factors must be considered by the Court:

1. Is the transferee district one where the suit "might have been brought?" *Hoffman v. Blaski*, 363 U.S. 335, 344, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960).

2. Does the balance of conveniences weigh in favor of transfer? *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

3. Do the public interests involved weigh in favor of transfer? *See id.* at 508–09, 67 S.Ct. 839.

■ While the first inquiry concerns the issue of whether an action could have initially been brought by the plaintiff in the proposed transferee district, the latter two concern the question of whether it should have been. The Court of Appeals for the Third Circuit has held that district courts are to contemplate "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995) (quoting 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters § 3847, at 370 (2d ed.1986)). Such factors include: 1) plaintiff's choice of forum; 2) defendant's preference; 3) where the claim arose;[10] 4) convenience to the parties as

---

**9.** It is in this aspect that this case is distinguishable from *Database America,* on which Vality heavily relies. There, because the defendant was not subject to personal jurisdiction within the District of New Jersey, the court was faced with a choice of dismissing the action for lack of in personam jurisdiction or transferring the case pursuant to

§ 1406(a). *See* 825 F.Supp. at 1215. Because personal jurisdiction is appropriate here, that case is uninstructive to the Court in this matter.

**10.** This factor will be treated as incorporating the concern of the Supreme Court with the "local interest in having localized controver-

indicated by their relative physical and financial condition; 5) convenience to the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; 6) location of books and records, limited to the extent that the files could not be produced in the alternative forum; 7) practical considerations that could make the trial easier, more expeditious, or less expensive; 8) congestion of the possible fora; and 9) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.* at 879–80. While a district court possesses a significant degree of discretion in deciding motions to transfer pursuant to § 1404(a), the movant bears the burden of justifying an affirmative disposition of such a motion. *See Pep Boys, Manny, Moe & Jack v. Am. Waste Oil Servs. Co.,* No. Civ.A.96–7098, 1997 WL 367048, at *8 (E.D.Pa. June 25, 1997).

Given that venue is proper wherever a corporate defendant is subject to personal jurisdiction, IMS had the right to, and could have brought this action in the District of Massachusetts, where Vality is both incorporated and headquartered.[11] *See* 28 U.S.C. § 1391(c); *Uti Corp. v. Plating Resources, Inc.,* No. Civ.A.99–253, 1999 WL 286441, at *5 (E.D.Pa. May 7, 1999). Therefore, this factor does not preclude the Court from granting the motion to transfer of Vality.

■ While this action might have been brought in the District of Massachusetts,

the other factors to be considered dictate that the motion to transfer pursuant to § 1404(a) be denied. As a starting point, it should be pointed out that in ruling on a defendant's motion to transfer venue, the plaintiff's original choice should not be lightly disturbed. *Jumara,* 55 F.3d at 879. Vality is correct, however, in pointing out that this factor is not, by itself, dispositive.

■ Because IMS originally selected this district as the venue for its declaratory judgment action, the first *Jumara* factor weighs heavily in favor of the retention of this action in this district. The contrary preference of Vality for proceeding in the District of Massachusetts, while not entitled to similar weight, registers in favor of transfer.

Consideration of where the claim arose, the third *Jumara* factor, weighs against transfer. *See* 55 F.3d at 882. Vality contends that Dr. Scrub, the product alleged to infringes upon its rights to the matching software, is actually offered by a subsidiary of IMS, IMS Health Strategic Technologies, headquartered in Atlanta, Georgia. IMS challenges this assertion.[12] However, even accepting *arguendo* the contention of Vality, the materials submitted by the defendant in support of its motion indicate that information about Dr. Scrub is available through one individual in Atlanta, and another in Plymouth Meeting, Pennsylvania. (*See* Exhibit B to the Reply in Support of Motion of the Defendant

---

sies decided at home." *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839.

**11.** Vality is therefore subject to general jurisdiction in the District of Massachusetts, as in order "to establish general jurisdiction, the plaintiff must show that the defendant has maintained 'continuous and systematic' contacts with the forum." *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,* 75 F.3d 147, 151, n.3 (3d Cir.1996) (quoting *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, n.9 and 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Vality's incorporation and headquartering in Massachusetts unquestionably constitute the requisite contacts in this case.

**12.** Specifically, IMS states: "[r]eference to the web page attached to the Affidavit of Stephen Gregorio reveals that Dr. Scrub 'cleans and enriches' information that is sent and transmitted through the 'Cornerstone' electronic territory management system of IMS Health's subsidiary, IMS Health Strategic Technologies. This does not change the fact that Dr. Scrub is a product of IMS Health, principally developed, marketed, produced and supported in Plymouth Meeting, Pennsylvania." (Sur–Reply at 5) (citation omitted) (emphasis omitted).

**470**

("Reply")). Therefore, it is far from clear that this product line lacks connections with this district specifically.[13] Furthermore, the plaintiff resides here, and importantly, the contract was executed here and the alleged breaches were centered here. Consequently, this district has a localized interest in deciding this controversy here, as the claim may be said to have arisen, at least in substantial part, in the Eastern District of Pennsylvania. *See generally Gulf Oil*, 330 U.S. at 508, 67 S.Ct. 839. The third factor thus also weighs against transfer.

Next, although Vality is a smaller corporation than is IMS, and might conceivably suffer some burden in proceeding with this action in a distant forum, *see* affidavit of Stephen Gregorio ¶¶ 4–6, the fact remains that Vality has not shown that it would be financially or physically unable to pursue this matter in this disfavored forum. Nor has it shown that it would be facing likely physical or financial ruin as a result of such an effort. As per the account of its own Chief Financial Officer, Vality had revenues for the 1998 fiscal year alone totaling $17.4 million. *See id.* at ¶ 6. While smaller than IMS, Vality is thus far from financially feeble, and therefore, this factor does not affect the determination.

As to the fifth *Jumara* factor, the parties each argue that their respectively disfavored fora would pose great inconveniences to their witnesses. However, neither party alleges that even one of its witnesses would be unavailable for trial in either forum, and therefore this factor is similarly devoid of significant importance. Concerning the sixth factor, there is no indication, regardless of the present location of the relevant books and records, that the files in the possession of both Vality and IMS could not be produced in either forum, especially in this age of ubiquitous photo copying and computer technology. This factor will thus too be of minimal weight in the balance.

The seventh and eighth considerations are best combined here. Identifying a factor which could make the trial more expeditious, Vality notes that the Eastern District of Pennsylvania is significantly overburdened in terms of its caseload, especially when compared to the District of Massachusetts. Specifically it contends that while an average of 279 cases per judge were filed in the District of Massachusetts in 1998 (251 civil), an average of 421 per judge were filed in the Eastern District of Pennsylvania (392 civil). Vality further notes that while the District of Massachusetts has no vacant judgeships, there are several judicial vacancies in this district. (Def. Mem. at 18). Moreover, Vality asserts that the Massachusetts action has progressed significantly further than this one, as discovery has already begun in that court. While IMS does not take issue with the assertions of Vality concerning docket congestion, it does dispute the contention of the defendant as to the progress of the Massachusetts action.

---

**13.** The proposition that Dr. Scrub is appropriately the sole focus of the complaint of Vality is itself questionable. In delineating Vality's concerns with the activities of IMS, the February 5, 1999 letter from Mark Atkins to Stephen Engber states:

It should be noted for clarity, any discussions regarding an embedded use of our technology within your product portfolio (i.e. Dr. Scrub) or use in a service bureau capacity, using Vality's technology to provide data services to your clients, are outside of this license agreement and would warrant separate discussions, which would entail separate terms and conditions.

(Exhibit D to Def. Mem.).

Further, in the March 25, 1999 letter from Stephen Engber to Mark Atkins, the Vice President of IMS stated: "Fifth, we are uncertain as to why you keep focusing on our Dr. Scrub product, which does not differ in any material way (relating to the agreements) from our other products which use the MatchWare software." (Exhibit H to Affidavit of Inez H. Friedman at 2).

Dr. Scrub appears to be given as merely one example of allegedly improper uses of the matching software, as opposed to the sole infraction. Given the above analysis, however, I conclude that this is a point of only moderate import.

Specifically, IMS states that it has not yet responded to the complaint of Vality in that action. (Sur–Reply at 4). Vality actually corroborates this account in its statement that "[d]iscovery in the Massachusetts [a]ction would have proceeded even further but for IMS's refusal to respond to correspondence from Vality's counsel." (Reply at 18). Furthermore and most significantly, a 60 day extension of time has been granted to IMS by the court in the Massachusetts action, and thus, not until at least September 1 or thereabouts will discovery actually proceed in that matter. (*See* Order of the Honorable Edward F. Harrington, J. of July 1, 1999, Granting the Motion of IMS for a 60 day Extension of Time to Move or Respond to the Complaint and for a Protective Order Regarding Discovery).

Even were this Court to accept the contention of Vality as to the relative progress of the two actions as accurate, it is not as compelling as the defendant believes it to be, given that " 'docket congestion is not given much weight in a § 1404(a) consideration.' " *Rightime Econometrics, Inc. v. Ashworth*, No. Civ.A.95–0807, 1995 WL 613093, at *6 (E.D.Pa.1995) (quoting *Micheel v. Haralson*, 586 F.Supp. 169, 172 n. 5 (E.D.Pa.1983)). Further and more importantly, mindful of the principle of judicial expediency, I find that transfer or dismissal of this action would be inappropriate, even if the Massachusetts action has progressed beyond the point at which this matter rests. To do so would be to encourage a party confronted with an action against it in an inconvenient forum to simply forge quickly ahead in litigating the identical issues in a more convenient forum. Moreover, I am not persuaded that there is much chance that the dispute would be resolved in a more expedient manner were it to be transferred.[14] In general, a policy which encourages the filing of two lawsuits when only one is truly needed would prove completely antithetical to the end of expediency, and should not be facilitated, even if I had a short-sighted desire to reduce my docket. *See* Fed. R.Civ.P. 1. Therefore neither the seventh nor eighth factor weighs significantly in favor of transfer.

Given that the first eight *Jumara* factors, when combined, militate strongly against transfer, the transfer motion of Vality will be denied on the basis of the preceding analysis alone. Thus, as far as the ninth factor is concerned, I will state only that in cases wherein jurisdiction is predicated at least in part upon diversity of citizenship, this Court routinely applies any applicable state law, as does Judge Harrington in the District of Massachusetts. I am confident that the fact that I do so more frequently in the context of Pennsylvania law while he does so more often in the context of Massachusetts law is of relatively minor significance in this calculus. Thus, while I suspect that Pennsylvania law would govern much if not all of the dispute in this case, especially given the absence of an actual conflict between the law of Pennsylvania and Massachusetts governing contractual interpretation,[15] I

14. This is especially so given the minimal progress of the Massachusetts action up to the issuance of the stay order there.

15. As delineated in *Furman Lumber, Inc. v. Mountbatten Surety Co., Inc.*, there is no conflict between the basic law of contract interpretation of Pennsylvania and Massachusetts:
Under Pennsylvania law, "[t]he task of interpreting a contract is generally performed by a court rather than by a jury." *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983). Only if a contractual term is deemed to be ambiguous does its interpre-tation become a jury question. *Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174, 1178 (3d Cir.1979). A contractual "term is ambiguous only if reasonable people, considering it in the context of the entire [document], would honestly ascribe different meanings to it." *Allstate Ins. Co. v. Brown*, 834 F.Supp. 854, 857 (E.D.Pa.1993) . . . . Massachusetts . . . [is] in accord. *See Commercial Union Ins. Co. v. Boston Edison Co.*, 412 Mass. 545, 591 N.E.2d 165, 172 (1992) ("[W]here [a] contract contains ambiguities a question of fact for [the] jury is presented.") (citation omitted) . . . .

find a lengthy discussion of the effect of the choice of law on this issue to be unnecessary at this time.

## C. Conclusion

In sum, weighing in favor of transfer is the preference of Vality for proceeding in Massachusetts. Militating against transfer are the important preference of IMS, the interest of this district in having localized controversies decided locally, the need to promote judicial expediency over the long term, and possibly the familiarity of this Court with the application of Pennsylvania law. When combined with the principle that it is the responsibility of the movant to justify a decision to transfer, I find that while the District of Massachusetts is clearly one in which the action "might have been brought," it is not one in which the dispute should be resolved. Vality has not carried its burden of persuading the Court that transfer is appropriate.

## V. Stay

 Just as the decision whether or not to exercise its jurisdiction over a declaratory judgment action is left to the discretion of the district court, the decision of whether or not to stay an action seeking a declaratory judgment is similarly discretionary. *See Wilton,* 515 U.S. at 288, 115 S.Ct. 2137 (1995). The Court of Appeals for the Third Circuit has espoused five factors to be considered when making such a determination in the context of a motion for a stay: (1) whether there are similar factual determinations necessary in both fora and therefore duplicative litigation should be avoided; (2) the likelihood that a declaratory judgment would resolve the uncertainty of the obligation giving rise to the controversy; (3) the convenience of the parties; (4) the public interest in the set-

tlement of the uncertainty of the obligation; and (5) the availability and relative convenience of other remedies. *See Terra Nova Ins. Co., Ltd. v. 900 Bar, Inc.,* 887 F.2d 1213 (3d Cir.1989).

 Here the factual issues in both this district and the District of Massachusetts are nearly identical. IMS is seeking a declaration that it did not infringe on any copyrights held by Vality, that it did not misappropriate or misuse any trade secrets belonging to Vality and that it did not breach the terms of the 1994 agreements. In the Massachusetts action, Vality has raised affirmative claims sounding in copyright infringement, breach of contract, breach of implied covenant of good faith and fair dealing, quantum meruit and misappropriation of trade secrets. (Def. Mem. at 10). The facts and circumstances giving rise to both are identical, and litigating in both fora would certainly be an exercise in needless duplication.

A declaratory judgment would likely resolve the controversy at hand, because a declaration that IMS did not infringe on the copyrights of Vality, misappropriate any trade secrets of the latter or breach the 1994 agreements would preclude Vality from recovery on either of the remaining two grounds in the Massachusetts action, breach of the implied covenant of good faith and fair dealing and quantum meruit. Appropriate pleadings and a framing of the issues by the defendant in this case would, as well, allow resolution of Vality's claims against IMS. The convenience of the parties, public interests involved and the availability and relative convenience of other remedies are all incorporated into the § 1404(a) equation, and just as all of these factors indicate that transfer is inap-

---

No. Civ.A.96–7906, 1997 WL 539685, at *9–*10 (E.D.Pa. Aug.6, 1997); *see also Generali v. Saliba,* No. 934361, 1994 WL 879656, at *3 (Mass.Super.Ct.1994) ("The interpretation of an unambiguous contract is a question of law for the Court to decide. (citation omitted). The determination of whether the terms of a

contract are ambiguous is a question of law. (citation omitted). If a contract contains ambiguities, however, a question of fact for the factfinder exists." (citation omitted)). Thus, there is no conflict between the legal principles governing contract interpretation in Pennsylvania and Massachusetts.

propriate here, each similarly disfavors a stay of these proceedings.

Accordingly, the motion of Vality to stay these proceedings will be denied.

## VI. Cross Motion of IMS to Enjoin Vality from Proceeding in the Massachusetts Action

One of the purposes of the first-filed rule not discussed previously is that litigants should have a "single determination of their controversy, rather than several decisions which if they conflict may require separate appeals to different circuit courts of appeals." *University of Pennsylvania*, 850 F.2d at 974 (quoting *Crosley Corp. v. Westinghouse Elec. & Mfg. Co.*, 130 F.2d 474, 475–76 (3d Cir.1942)). The *University of Pennsylvania* court went on to explain that "[c]omity must serve as a guide to courts of equal jurisdiction to exercise forbearance to avert conflicts and to avoid 'interference with the process of each other.'" (quoting *Kline v. Burke Const. Co.*, 260 U.S. 226, 229, 43 S.Ct. 79, 67 L.Ed. 226 (1922)). Vality also correctly cites *Ricoh Co. Ltd. v. Honeywell, Inc.* in support of the proposition that "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court and not simultaneously before two tribunals." 817 F.Supp. 473, 487 (D.N.J.1993).

 It is for this reason that the first-filed rule "gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *University of Pennsylvania*, 850 F.2d at 971–72. The Court is aware that IMS has been granted a sixty day extension of the deadline after which it must respond to discovery requests in the Massachusetts action. (*See* Order of the Honorable Edward F. Harrington, J. of July 1, 1999, Granting the Motion of IMS for a Sixty Day Extension of Time to Move or Respond to the Complaint and for a Protective Order Regarding Discovery). Nonetheless, given the foregoing analysis,

and the conclusion of the Court that these issues should find their ultimate resolution in this tribunal, it would be a logically inconsistent and wasteful result were this Court not to enjoin Vality from proceeding with duplicative litigation in the District of Massachusetts, even after the current sixty day extension expires. Consistent with this rationale, Vality will be enjoined from proceeding with the Massachusetts action.

An appropriate Order follows.

## ORDER

**AND NOW** this 28th day of July, 1999, upon consideration of the motion of defendant Vality Technology Inc. to dismiss the complaint, or in the alternative to transfer or stay these proceedings (Document No. 2), the response of plaintiff IMS Health Incorporated thereto, the cross-motion of IMS to enjoin defendant Vality from proceeding with the later-filed, related action in the United States District Court for the District of Massachusetts (Document No. 6), the reply and sur-reply of IMS thereto, and for the reasons set forth in the foregoing Memorandum, it is hereby **ORDERED** that:

1. The motion of defendant Vality Technology Inc. to dismiss, transfer or stay these proceedings is **DENIED**.

2. The cross-motion of plaintiff IMS Health Inc. to enjoin Vality from proceeding with the later-filed, related action in the United States District Court for the District of Massachusetts is **GRANTED**.

**IT IS FURTHER ORDERED** that Vality Technology, Inc., its agents and attorneys shall not prosecute further or take any action in the case of Vality Technology, Inc. v. IMS Health, Inc., Civil Action No. 99–CV–10947 EFH, in the United States District Court for the District of Massachusetts, except to secure the status quo therein or have that action placed in suspense, all pending final resolution of the instant action and any appeals or review thereof.

IT IS FURTHER ORDERED that Vality Technology Inc. shall serve and file its answer to the complaint herein no later than August 30, 1999.